UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/22/2010
```

-------------------------------------------------- X

BRAD CROSBY and RICHARD
DANIELS,

          Plaintiffs,

     - against -

THE CITY OF NEW YORK, ET AL.,

       Defendants.

**OPINION AND ORDER**

09 Civ. 9693 (SAS)

-------------------------------------------------- X

LUIS REIS,

          Plaintiff,

     - against -

THE CITY OF NEW YORK, ET AL.,

       Defendants.

09 Civ. 9694 (SAS)

-------------------------------------------------- X

PAUL RICHARDSON,

          Plaintiff,

     - against -

THE CITY OF NEW YORK, ET AL.,

       Defendants.

09 Civ. 9695 (SAS)

-------------------------------------------------- X

1

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.   INTRODUCTION

The District Attorney's Office of New York County ("DANY"),

which is not a party to the above-captioned civil-rights actions, moves for an order

quashing portions of three subpoenas *duces tecum* served on DANY by plaintiffs.

For the reasons provided below, DANY's motion is granted in part and denied in

part.

## II.   BACKGROUND

In 2009, amidst a public outcry from the gay community that the New

York Police Department ("NYPD") was entrapping men on prostitution charges,[1]

---

[1]      *See* Duncan Osborne, "DA Pledges Prostitution Bust Probe," *Gay City News* (Mar. 27, 2009), Ex. B to Declaration of Michael L. Spiegel, Plaintiffs' Counsel, in Opposition to DANY's Motion to Quash Subpoenas ("Spiegel Decl."); *see also* Christine Hauser, "Among Gay Men, Arrests Spark Concern of Being Singled Out," *N.Y. Times* (Feb. 15, 2009) (recounting a 52-year-old arrestee's version of the events: that he, Robert Pinter, was approached at an adult store by a younger, handsome man (who unbeknownst to Pinter was an undercover police officer); the two agreed to leave to have consensual sex; when the younger man offered Pinter money, Pinter refused, thinking it "odd for a younger man to want to pay him for sex"; and Pinter being arrested for prostitution). *Cf. Casale v. Kelly*, Nos. 05 Civ. 5442, 08 Civ. 2173, — F. Supp. 2d —, 2010 WL 1685582, at *1 (S.D.N.Y. Apr. 26, 2010) (holding New York City in contempt of court for failing to diligently comply with court orders to cease enforcing three unconstitutional loitering statutes, and observing: "More disturbing still, it appears that the laws — which target panhandling, remaining in a bus or train station, and 'cruising' for sex — have been [unlawfully] enforced particularly against the poor and gay men."); *Casale v. Kelly*, 257 F.R.D. 396, 415 n.132 (S.D.N.Y. 2009) ("Insofar as [New York Penal Law section] 240.35(3) has been used to harass gay men seeking to

2

DANY conducted two separate investigations into the arrests. DANY's Official

Corruption Unit conducted one of the investigations and it concerned whether

undercover officers #3371, #5601, and #31107 — who were assigned to the

NYPD's Manhattan South Vice Enforcement Squad — committed crimes in

pursuit of the arrests.[2] Ultimately, DANY declined to criminally charge any of the

officers.[3]

Prosecutors in DANY's Trial Division conducted the other

investigation, which pertained to the viability of the prostitution charges.[4] While

some of the arrestees had already pled to lesser non-criminal offenses, namely

---

engage in consensual sexual activity . . . it is likely that some potential plaintiffs
would not choose to come forward individually to publicly challenge past
prosecution. This does not lessen the gravity of their claims."); *Martinez v. Port
Auth. of N.Y.*, No. 01 Civ. 721, 2005 WL 214333, at *9 (S.D.N.Y. Sept. 2, 2005)
(affirming jury verdict that "the Port Authority had a policy, custom or practice of
initiating public lewdness arrests as part of 'sweeps' to clear the restrooms of
persons subjectively viewed by the Port Authority as undesirable, regardless of
whether there was probable cause to make the arrests"), *aff'd*, 445 F.3d 158 (2d
Cir. 2006) (*per curiam*).

[2]     The Official Corruption Unit is primarily responsible for investigating
and prosecuting official misconduct. *See* Memorandum of Law in Support of
DANY's Motion to Quash Subpoenas ("DANY Mem.") ¶ 33.

[3]     *See id.* ¶ 37.

[4]     The Trial Division is responsible for the prosecution of misdemeanor
offenses, including prostitution cases. *See* Affirmation of Leila Kermani, DANY's
Counsel, in Support of DANY's Motion to Quash Subpoenas ("Kermani Aff.")
¶ 12.

3

disorderly conduct,[5] DANY dismissed a number of the prosecutions.[6]

Plaintiffs here are four of the men arrested for prostitution. According to the complaints, the charges against each were dropped.[7] Plaintiffs allege that their arrests not only were baseless, but were part of an unconstitutional program by New York City to pursue nuisance abatement lawsuits against businesses by making false arrests for prostitution at the business sites, then using the fact of those arrests to bolster the City's efforts to close those businesses — in these cases, a pornography shop and a spa.[8] Indeed, say plaintiffs, their *arrests* (as opposed to

---

[5]    At least one of the individuals who pled to disorderly conduct, Robert Pinter, successfully vacated his conviction — a motion DANY did not oppose. Thereafter, DANY dismissed the accusatory instrument. *See Pinter v. City of New York*, No. 09 Civ. 7841, Amended Complaint ¶¶ 110-111, 117-118; Certificate of Disposition in *People v. Pinter*, 2008NY075734, Ex. G to Declaration of James I. Meyerson in Opposition to Defendant's Motion for Summary Judgment in *Pinter v. City of New York* ("Meyerson Decl."); DANY's Affirmation and Response to Defendant's Motion to Vacate Conviction in *People v. Pinter*, Ex. H to Meyerson Decl.

[6]    *See* Email from Erin Duggan, DANY Communications Director, to Sharon Stapel, Director of New York City Gay and Lesbian Anti-Violence Project (Mar. 31, 2010), Ex. C to Spiegel Decl.

[7]    *See Crosby and Daniels v. City of New York*, Amended Complaint ("*Crosby* Compl.") ¶¶ 10, 13; *Reis v. City of New York*, Amended Complaint ("*Reis* Compl.") ¶ 11; *Richardson v. City of New York*, Amended Complaint ("*Richardson v. City of New York*") ¶ 11.

[8]    *See* Plaintiffs' Memorandum of Law in Opposition to DANY's Motion to Quash Subpoenas ("Pl. Mem.") at 1-7; *see also Crosby* Compl. ¶ 14; *Reis* Compl. ¶ 10; *Richardson* Compl. ¶ 10.

4

convictions) were listed, among others, in affidavits in support of the City's lawsuits to shut down the Unicorn DVD Store and the Miracle Spa.[9]

Plaintiffs emphasize that the arrests were for *being* prostitutes, not *patronizing* prostitutes.  Plaintiffs state that they are obviously unlikely prostitutes: they are gainfully employed, have never been arrested for prostitution, and were in their mid- to late-thirties when arrested.[10]  According to plaintiffs, nineteen of the twenty-three currently-identifiable men arrested by undercover officers #3371 and #31107 for prostitution in 2008 were over thirty years of age at the time of their arrests, eight were over forty, and one was fifty-two years old.[11]

On November 25, 2009, plaintiffs served three subpoenas *duces tecum* on DANY, seeking "all documents, files, records, audio or visual recordings, notes and materials of whatever kind" concerning the prosecutions of plaintiffs.[12]  The subpoenas also seek "all documents, files, records, audio or visual records, notes and materials of whatever kind concerning the investigation into arrests by the Manhattan South Vice Enforcement Squad, including but not limited to the arrests

---

[9]     *See* Pl. Mem. at 3 (citing Exs. F, H to Spiegel Decl.).

[10]    *See id.* at 5 (citing Spiegel Decl. ¶ 13).

[11]    *See* Spiegel Decl. ¶ 14.

[12]    Ex. D to Spiegel Decl.

of [plaintiffs] and other arrests made by New York City undercover officers #3371 and #31107."[13] Along with the subpoenas, plaintiffs provided signed and notarized authorizations waiving their rights to have their criminal case files sealed.

By letters dated December 15, 2009, DANY responded to plaintiffs' subpoenas.[14] DANY provided a number of documents from plaintiffs' criminal case files but objected to discovery of certain documents from those files that DANY considers attorney work product or otherwise privileged and/or confidential.[15] DANY also objected wholesale to discovery of *any* document from the Official Corruption Unit investigation into wrongdoing by the undercover officers on the grounds that the file is sealed and contains privileged attorney work product in addition to information from sealed criminal cases.[16] DANY did not provide a privilege log of the Official Corruption Unit investigation file until February 4, 2010.[17]

On March 12, 2010, DANY filed a motion to quash with this Court.

---

[13]     *Id.*

[14]     *See* Exs. A, B, & C to Kermani Aff.  DANY also objected that the subpoenas were overbroad.  Before this Court, DANY has not pressed this point; therefore, I do not address it.

[15]     *See id.*

[16]     *See id.*

[17]     *See* Ex. D to Kermani Aff.

DANY withdrew this application, however, when the Assistant District Attorney

("ADA") assigned to respond to the subpoenas learned that, in addition to the

investigation by the Official Corruption Unit, ADAs in the Trial Division

conducted a separate investigation into the merits of the prostitution charges.

DANY produced some documents from this file, with redactions,[18] but objected to

full disclosure — again based on the work-product privilege and New York's

sealing law.

On March 30, 2010, DANY filed the instant motion to quash those

portions of the subpoenas to which DANY raised objections.[19]  Thereafter, the

Court ordered DANY to submit the withheld documents for *in camera* inspection.

DANY provided the Court with a number of documents on May 11, 2010.  During

its *in camera* review, the Court discovered that DANY's submission was facially

incomplete.  DANY submitted additional documents on June 2, 2010.

## III.   DISCUSSION

### A.   Official Corruption Unit File

The investigative file of the Official Corruption Unit contains the

---

[18]     *See* DANY Mem. ¶ 20.

[19]     Federal Rule of Civil Procedure 45(c)(3)(A)(iii) provides that, on a timely motion, a court may quash or modify a subpoena that "requires disclosure of privileged or other protected matter, if no exception or waiver applies[.]"

following documents: (1) a list of nineteen arrestees' names (three of whom are plaintiffs Daniels, Crosby, and Richardson) and their arrest numbers and birth dates; (2) for each of those individuals, a set of criminal case papers; (3) three newspaper clippings; (4) three facsimile coversheets; and (5) a memorandum to the file.[20]

### 1.   New York Criminal Procedure Law Sections 160.50 and 160.55

DANY first objects to disclosure of the entire Official Corruption Unit file on the ground that it is sealed pursuant to New York Criminal Procedure Law Section 160.50 ("Section 160.50"). DANY is statutorily prohibited from disclosing such sealed records, absent an unsealing order or consents from the targets of the investigation (*i.e.*, undercover officers #3371, #5601, #31107).[21] DANY additionally objects to discovery of the list of arrestees and each of their criminal case papers because those cases are sealed by operation of either Section

---

[20]     *See* DANY Mem. ¶ 36(a)-(d).

[21]     "A number of cases have considered the appropriate procedure to be followed to effect an unsealing of criminal records pursuant to § 160.50 in the context of discovery in a federal civil suit, and the consensus seems to be that a plaintiff can either apply to the state court to unseal the records, or can subpoena the district attorney, or seek discovery if the district attorney is a party to the proceeding. If the district attorney moves to quash a subpoena, or objects to a discovery demand, the issue is appropriately before the federal court." *Fountain v. City of New York*, No. 03 Civ. 4526, 2004 WL 941242, at *6 (S.D.N.Y. May 3, 2004) (collecting cases).

160.50 or a similar statute Section 160.55. Again, release of such information

requires an unsealing order or proper consents from those arrestees who are not

plaintiffs here ("non-plaintiff arrestees").

> Section 160.50 provides, in relevant part:
>
>> Upon the termination of a criminal action or proceeding against a person in favor of such a person . . . all official records and papers . . . relating to the arrest or prosecution [shall be sealed, and shall not be] made available to any person or public or private agency . . . but only to the person accused or to such person's designated agent.[22]

"The purpose of the provision is to ensure 'that one who is charged but not

convicted of an offense suffers no stigma as a result of his having once been the

object of an unsustained accusation.'"[23] Similarly, Section 160.55 requires the

sealing of certain records of an individual convicted of a violation — a non-

---

[22]    N.Y. Crim. Pro. L. § 160.50. *Accord Haus v. City of New York*, No. 03 Civ. 4915, 2006 WL 1148680, at *1 (S.D.N.Y. Apr. 24, 2006) ("[Section 160.50] requires, in the case of people arrested but not convicted, that arrest records filed with the state courts or held by law-enforcement authorities be sealed and not disclosed except in limited circumstances.").

[23]    *MacNamara v. City of New York*, No. 04 Civ. 9612, 2006 WL 3298911, at *1 n.1 (S.D.N.Y. Nov. 13, 2006) (quoting *Matter of Hynes v. Karassik*, 419 N.Y.S.2d 942, 944 (1979)). *Accord Katherine B. v. Cataldo*, 800 N.Y.S.2d 363, 366 (2005) ("'That detriment to one's reputation and employment prospects often flows from merely having been subjected to criminal process has long been recognized as a serious and unfortunate by-product of even unsuccessful criminal prosecutions. The statute's design is to lessen such consequences.'" (quoting *Hynes*, 419 N.Y.S.2d at 944)).

criminal offense.[24]

However, in cases presenting federal questions, such as here, discoverability, privileges, and confidentiality are governed by federal law, not state law.[25]  "[S]tate statutory privileges . . . must be construed narrowly, 'and must yield when outweighed by a federal interest in presenting relevant information to a trier of fact.'"[26]  In other words, state privilege rules should not be permitted to "frustrate the important federal interests in broad discovery and truth-seeking and the interest in vindicating important federal substantive policy

---

[24]     Section 160.55 specifically provides: "Upon the termination of a criminal action or proceeding against a person by the conviction of . . . a violation . . . all official records and papers relating to the arrest or prosecution, including all duplicates and copies thereof, on file with the division of criminal justice services, police agency, or prosecutor's office shall be sealed and not made available to any person or public or private agency" except in limited circumstances.  N.Y. Crim. Pro. L. § 160.55(1).

[25]     *See* Fed. R. Evid. 501 (stating privileges in federal-question cases are governed by federal common law); *United States v. Goldberger & Dubin*, 935 F.2d 501, 505 (2d Cir. 1991); *Von Bulow v. Von Bulow*, 811 F.2d 136, 141-42 (2d Cir. 1987); *MacNamara*, 2006 WL 3298911, at *2; *Haus*, 2006 WL 1148680, at *2; *Daniels v. City of New York*, No. 99 Civ. 1695, 2001 WL 228091, at *1 (S.D.N.Y. Mar. 8, 2001); *Cruz v. Kennedy*, No. 97 Civ. 4001, 1997 WL 839483, at *1 (S.D.N.Y. Dec. 19, 1997); *King v. Conde*, 121 F.R.D. 180, 187 (E.D.N.Y. 1988).

[26]     *Daniels*, 2001 WL 228091, at *1 (quoting *United States v. One Parcel of Property at 31-33 York Street*, 930 F.2d 139, 141 (2d Cir. 1991)).

such as that embodied in section 1983."[27]  Nonetheless, "the policies underlying

state evidentiary privileges must still be given serious consideration, even if they

are not determinative."[28]

Sections 160.50 and 160.55 protect "important privacy interests, and

'a strong policy of comity between state and federal sovereignties impels federal

courts to recognize state privileges where this can be accomplished at no

substantial cost to federal substantive and procedural policy.'"[29]  This Court must

therefore "balance the deference to be accorded state-created privileges with the

need for the information sought to be protected by the privilege."[30]

---

[27]     *King*, 121 F.R.D. at 187. As Judge Jack B. Weinstein aptly explained:
"Mere adherence to state rules would often improperly elevate the role of
privileges in federal question cases. Moreover, state rules protecting state officers
must always be viewed with caution because they may be parochially designed to
thwart federal interests: 'It obviously would make no sense to permit state law to
determine what evidence is discoverable in cases brought pursuant to federal
statutes whose central purpose is to protect citizens from abuses of power by state
and local authorities. If state law controlled, state authorities could effectively
insulate themselves from constitutional norms simply by developing privilege
doctrines that made it virtually impossible for plaintiffs to develop the kind of
information they need to prosecute their federal claims.'" *Id.* at 187-88 (quoting
*Kelly v. City of San Jose*, 114 F.R.D. 653, 656 (N.D. Cal. 1987)).

[28]     *Burka v. New York City Transit Auth.*, 110 F.R.D. 660, 664 (S.D.N.Y.
1986). *Accord Haus*, 2006 WL 1148680, at *2; *Daniels*, 2001 WL 228091, at *1.

[29]     *King*, 121 F.R.D. at 187 (quoting *Lora v. Board of Educ.*, 74 F.R.D.
565, 576 (E.D.N.Y. 1977)).

[30]     *Daniels*, 2001 WL 228091, at *1.

Federal courts commonly order production of documents sealed

pursuant to Sections 160.50 or 160.55, particularly where the documents are

"cleansed of the names and other identifying information of the [non-party]

arrestees . . . ."[31] The worthy goals of Sections 160.50 and 160.55 as well as a

litigant's need for pertinent discovery can usually be honored simultaneously by

redaction of information that identifies, directly or indirectly, persons entitled to

protection under these statutes.[32]

Here, plaintiffs contend that the City is liable for an unconstitutional

policy or practice of falsely arresting men perceived to be gay on charges of

prostitution to support nuisance abatement lawsuits to close businesses viewed by

the City as undesirable. The arrests of plaintiffs are but a few of the total arrests

---

[31]     *Haus*, 2006 WL 1148680, at *3 (collecting cases). *Accord MacNamara*, 2006 WL 3298911, at *3-*4.

[32]     *See Haus*, 2006 WL 1148680, at *4-*5 (ordering production of NYPD arrest and on-line booking documents but permitting redaction of information identifying non-party arrestees); *see also In re Am. Tobacco Co.*, 880 F.2d 1520, 1530-31 (2d Cir. 1989) (approving district court order granting access to a medical study because redaction of subjects' identities adequately protected the New York statutory physician-patient privilege); *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1137 (9th Cir. 2003) (holding that redaction of information identifying third-parties from medical and personnel records allowed for disclosure); *Johnson by Johnson v. Thompson*, 971 F.2d 1487, 1497 (10th Cir. 1992) (approving district court order granting access to records of medical studies of infants where subjects' identities redacted); *Lora*, 74 F.R.D. at 579-84 (ordering release of student records under various protective provisions, including redaction of names).

that occurred under the alleged City program. Therefore, plaintiffs have a demonstrable need for information regarding the arrests of non-plaintiff arrestees, as well as the Official Corruption Unit's investigation into the undercover officers, in order to acquire a fuller picture of the circumstances surrounding their own arrests and current allegations. That DANY did not criminally charge the undercover officers does not diminish the relevance of the investigation to plaintiffs' claims.

In this connection, I reject DANY's suggestion that plaintiffs are on a fishing expedition. That DANY itself believed that the prostitution arrests were sufficiently suspect to warrant two different investigations — neither of which the Court believes DANY undertook lightly (especially the inquiry into possible criminal conduct by police officers) — demonstrates that plaintiffs' subpoenas seek discovery relevant to their claims of having been falsely arrested pursuant to an unconstitutional municipal policy or practice. Further, plaintiffs' allegations are not bald or conclusory. For example, plaintiffs' counsel avers that he has identified forty-three arrests of men for prostitution cited in affidavits submitted in support of nuisance abatement lawsuits filed by the City in 2008; many of these arrests, according to plaintiffs, did not result in criminal convictions.[33]

---

[33]     *See* Pl. Mem. at 4 (citing Spiegel Decl. ¶ 10).

13

Accordingly, DANY's objection to disclosure of the Official

Corruption Unit file based on Sections 160.50 and 160.55 is overruled, though

certain redactions are necessary to protect the identities of the undercover officers

and non-plaintiff arrestees. As to the undercover officers, DANY itself has

publicly disclosed that they were the targets of the Official Corruption Unit

investigation.[34]  Therefore, insofar as these officers are identified by their badge

numbers, unsealing the file does not risk further revealing their identities. The

investigator's memorandum is the only document from the Official Corruption

Unit investigation that refers to anyone other than the men arrested for prostitution.

To the extent that portions of this memorandum are ordered disclosed, as addressed

below, DANY shall redact information identifying officers  #3371, #5601, and

#31107, beyond their badge numbers.

With respect to the list of arrestees and the papers from their criminal

---

[34]     *See, e.g.*, DANY Mem. ¶ 37 ("After DANY's Official Corruption Unit
completed its investigation into the prostitution arrests of Manhattan South Vice
Enforcement Squad undercover police officers #3371 and #31107, the Official
Corruption Unit declined to bring charges against any police officer or any other
individual in connection with these arrests.").  As far as the Court is aware, DANY
has not disclosed publicly that the Official Corruption Unit inquiry also targeted
undercover officer #5601.  Nor did DANY disclose this fact to the Court privately.
Rather, the Court made this discovery during its *in camera* inspection of
documents submitted by DANY.  When the Court brought this fact to DANY's
attention, DANY admitted that it had inadvertently failed to identify undercover
#5601 as a subject of the Official Corruption Unit investigation.  Therefore, I see
no reason not to make this disclosure now.

14

cases (principally criminal complaints and supporting depositions), plaintiffs do not presently object to redaction of non-plaintiff arrestees' names, addresses, and telephone numbers.[35] Plaintiffs, however, object to redaction of birth dates, ages, occupations, prior arrests, or homeownership — information that is relevant to plaintiffs' allegation that the men arrested for prostitution, including themselves, "were not, in fact, engaging in prostitution when they were arrested."[36] Demographic, employment, and arrest information of non-plaintiff arrestees will elucidate, even if only by inferences, the facts of these cases, whatever those facts may be. In addition, disclosure of the criminal complaints and supporting depositions is warranted in order to test whether the documents in support of the prostitution busts were individualized or formulaic. DANY is ordered to disclose the list of arrestees and their criminal case papers, with redaction of non-plaintiffs' names, arrest numbers, and criminal court file numbers (the only potentially identifying information contained in these documents). Additionally, DANY shall redact the day (but not month or year) of birth.

DANY is also ordered to disclose the newspaper articles, which are

---

[35]   *See* Pl. Mem. at 12, 15.

[36]   *Id.* at 14-15.

15

already in the public sphere,[37] as well as the facsimile coversheets, which do not

refer to anyone whose consent is required for unsealing. Rather, the coversheets

bear the names of potential witnesses in these actions — the Official Corruption

Unit investigator and an officer in the NYPD Internal Affairs Bureau. Finally, I

note that these coversheets refer to thirty-eight pages of materials, across two

transmissions. DANY is ordered to produce to the Court within seven calendar

days of this Opinion and Order an affidavit from someone with knowledge of these

faxes attesting to the content of the transmissions and, specifically, whether or not

these thirty-eight pages have been produced to the Court for *in camera* inspection.

This affidavit may be provided to the Court *ex parte* for *in camera* review.

### 2.    Attorney Work-Product Privilege

DANY argues that the investigator's memorandum to the file is

privileged work product, citing Federal Rule of Civil Procedure 26(b)[38] and

---

[37]    *Cf. MacNamara*, 2006 WL 3298911, at *4 n.8 ("In balancing the
privacy interests of the non-party arrestees against the federal interest in broad
discovery of relevant information, it is relevant, though not dispositive, that the
names of 1793 arrestees were published in the *Village Voice* in September 2004.");
*Woodard v. City of New York*, No. 99 Civ. 1123, 2000 WL 516890, at *5
(S.D.N.Y. Mar. 10, 2000) (stating that privacy concerns are "hardly
prepossessing" where names of non-party arrestees are known to all parties and
events at issue are largely a matter of public record).

[38]    Rule 26(b)(3)(A) provides: "Ordinarily, a party may not discover
documents and tangible things that are prepared in anticipation of litigation or for
trial by or for another party or its representative (including the other party's

16

*Hickman v. Taylor*.[39]  Rule 26(b)(3), however, has no application in these

circumstances because DANY is not a party to this action.[40]  Indeed, "'courts have

consistently held that the privilege [set forth in Rule 26(b)] is unavailable when a

prosecutor in a prior criminal investigation later objects to discovery of her work

product by a litigant in a related civil lawsuit.'"[41]

   Nevertheless, the work-product doctrine articulated in *Hickman* and

its progeny, which is broader than the protection supplied by Rule 26(b)(3),[42] may

---

attorney, consultant, surety, indemnitor, insurer, or agent)."

 [39] *See* 329 U.S. 495, 508 (1947).

 [40] *See Jean v. City of New York*, No. 09 Civ. 801, 2010 WL 148420, at
*1 (E.D.N.Y. Jan. 12, 2010) ("[B]y its express terms [Rule 23(b)(3)(A)] affords
protection only to documents prepared 'by or for another party or its
representative.'  As the DA is not a party, Rule 26(b)(3) simply does not apply."
(citation omitted)); *Abdell v. City of New York*, No. 05 Civ. 8453, 2006 WL
2664313, at *2 (S.D.N.Y.  Sept. 14, 2006) ("By its own terms, Rule 26(b)(3) does
not protect materials prepared by lawyers for non-parties . . . .  Accordingly, courts
have repeatedly held that Rule 26(b)(3) does not shield work produced for non-
parties.").

 [41] *Abdell*, 2006 WL 2664313, at *3 (quoting *Klein v. Jefferson Parish
School Bd.*, No. Civ. A. 00-3401, 2003 WL 1873909, at *3 (E.D. La. Apr. 10,
2003) and collecting cases) (alteration omitted).

 [42] *See id.* at *3 (citing *In re Grand Jury Subpoenas Dated March 19,
2002 and August 2, 2002*, 318 F.3d 379, 383 (2d Cir. 2003); *In re Grand Jury
Subpoena*, 220 F.R.D. 130, 141 (D. Mass. 2004); *U.S. Infor. Sys., Inc. v.
International Bhd. of Elec. Workers Local Union No. 3, AFL-CIO*, No. 00 Civ.
4763, 2002 WL 31296430, at *5 (S.D.N.Y. Oct. 11, 2002); *Maynard v. Whirlpool
Corp.*, 160 F.R.D. 85, 87 (S.D.W. Va. 1995)).

have application here. "[C]ourts have extended work-product protection to non-

parties when [doing so] vindicated the purposes underlying the [*Hickman*]

doctrine."[43] There are at least three such purposes:[44] protecting an attorney's

ability to formulate legal theories and prepare cases,[45] preventing opponents from

"free-loading" off their adversaries' work,[46] and preventing interference with

ongoing litigation.[47] "In some instances it was also significant that the non-party

---

[43]     *Jean*, 2010 WL 148420, at *2 (citing *Allied Irish Banks, P.L.C. v. Bank of America, N.A.*, 252 F.R.D. 163, 175 (S.D.N.Y. 2008); *In re Student Fin. Corp.*, No. 06-MC-69, 2006 WL 3484387, at *10 (E.D. Pa. Nov. 29, 2006); *Federal Election Comm'n v. Christian Coalition*, 179 F.R.D. 22, 24 (D.D.C. 1998); *Basinger v. Glacier Carriers, Inc.*, 107 F.R.D. 771, 772 (M.D. Pa. 1985)).

[44]     *See Jean*, 2010 WL 148420, at *2; *Abdell*, 2006 WL 2664313, at *4.

[45]     "[T]he work-product doctrine . . . is intended to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategies 'with an eye toward litigation,' free from unnecessary intrusion by his adversaries." *United States v. Adlman*, 134 F.3d 1194, 1196 (2d Cir. 1998) (quoting *Hickman*, 329 U.S. at 511). "Were the attorney's work accessible to the adversary, the *Hickman* court cautioned, 'much of what is now put down in writing would remain unwritten' for fear that the attorney's work would redound to the benefit of the opposing party." *Id.* at 1197 (quoting *Hickman*, 329 U.S. at 511).

[46]     "An attorney who has access to the results of his adversary's research and investigation has less incentive to be diligent in his own trial preparation, and '[d]iscovery was hardly intended to enable a learned profession to perform its functions either without wits or on wits borrowed from the adversary.'" *Abdell*, 2006 WL 2664313, at *4 (quoting *Hickman*, 329 U.S. at 516 (Jackson, J., concurring)).

[47]     "In performing his various duties . . . it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. Proper preparation of a client's case demands that he . . .

was at least potentially a party or had interests that were likely to be affected by the litigation in which the work product was sought."[48]

Even where work-product protection applies, the protection is not absolute. Disclosure of work product may be ordered if the party seeking it can demonstrate substantial need for the information and an inability to obtain the information, or a substantial equivalent of it, by other means without undue hardship.[49]

When evaluating whether to order disclosure of work product, courts have consistently distinguished between primarily factual work product and "core" work product, the latter of which includes the "mental impressions, conclusions, opinions, or legal theories of an attorney."[50] Although factual work product is

---

prepare his legal theories and plan his strategy without undue and needless interference." *Hickman*, 329 U.S. at 510-11.

[48]    *Jean*, 2010 WL 148420, at *2 (citing *In re Student Fin. Corp.*, 2006 WL 3484387; *Basinger*, 107 F.R.D. at 772).

[49]    *See In re Grand Jury Proceedings*, 219 F.3d 175, 190-91 (2d Cir. 2000); *Jean*, 2010 WL 148420, at *2; *Abdell*, 2006 WL 2664313, at *6-*7; *see also* Fed. R. Civ. P. 26(b)(3)(A)(ii).

[50]    *Abdell*, 2006 WL 2664313, at *6. According to Black's Law Dictionary, factual work product is "[a] lawyer's tangible work product that includes facts but not the lawyer's mental impressions[,]" whereas core work product, also known as opinion work product, is "[a] lawyer's opinions, conclusions, and legal theories arising from a client's case." Black's Law Dictionary (9th ed. 2009) at 1746.

subject to disclosure once the required showings are made, core work product is entitled to more stringent protection, protection described by some courts as "absolute" or "near absolute."[51]  In the Second Circuit, "'at a minimum such material is to be protected unless a highly persuasive showing [of need] is made.'"[52]  The high degree of protection accorded to core work product is such that not only parties, but also non-parties have been able to protect it even where work-product protection was otherwise denied.[53]

Comparison of two recent decisions — both involving a District Attorney's Office as a subpoenaed non-party — nicely illustrates the operation of the *Hickman* doctrine.  In *Abdell v. City of New York*, the court ordered DANY to disclose factual content — such as statements of police officers and other witnesses — contained in "DA Data Sheets" but permitted redaction of prosecutors'

---

[51]    *See, e.g.*, *In re Cendant Corp. Sec. Litig.*, 343 F.3d 658, 663 (3rd Cir. 2003) (near absolute); *National Union Fire Ins. Co. of Pittsburgh, Pa. v. Murray Sheet Metal Co.*, 967 F.2d 980, 983-84 (4th Cir. 1992) (absolute).

[52]    *In re Grand Jury Proceedings*, 219 F.3d at 190-91 (quoting *Adlman*, 134 F.3d at 1204) (alteration in original).

[53]    *See, e.g.*, *Abdell*, 2006 WL 2664313, at *4-6 (DANY permitted to redact handwritten notations reflecting opinions of ADAs from documents for which protection was denied); *Federal Election Comm'n v. Christian Coalition*, 178 F.R.D. 61, 87 (E.D. Va. 1998) (non-party required to produce "non-opinion" work product, but not "opinion" work product).

notations on those sheets that constituted core work product.[54]  In reaching this

conclusion, the court held that none of the policies underlying the *Hickman*

doctrine were implicated because (1) the DA Data Sheets are routinely disclosed to

the defense in criminal proceedings;[55] (2) there was no danger of freeloading

because the prior cases were criminal;[56] and (3) there was no risk of interfering

---

[54]     *See Abdell*, 2006 WL 2664313.  The DA Data Sheet is a form created
by an ADA early on in a criminal prosecution that may include a host of
information about the facts, the arrest, statements by the defendant, arraignment,
bail, identities of police or civilian witnesses, vouchered physical items, and 911
tapes. *See id.* at *1.

[55]     *See id.* at *4-*5 ("Accordingly, disclosing DA Data Sheets in civil
litigation can have no chilling effect on assistant district attorneys, because they
draft the worksheets with the expectation that defense attorneys may obtain them
as *Rosario* material." (citing, *inter alia*, *People v. Rosario*, 9 N.Y.2d 286, 289-90
(1961))).

[56]     *See id.* at *5 (citing, *inter alia*, *Doubleday v. Ruh*, 149 F.R.D. 601,
607 (E.D. Cal. 1993)).  In *Doubleday*, the court explained:

> The potential economic vice of a less diligent attorney
> raiding the file of a previously diligent attorney is lacking
> in the context of a former criminal defendant,    now
> plaintiff, seeking information from criminal files of a
> previous prosecution. As is generally the case in such a
> situation . . . plaintiff's attorney is seeking information
> directly pertinent to the issues in this civil case, is not
> seeking the information because he is too "lazy" to develop
> the information himself, and is seeking information solely
> within the possession of the prosecuting agency.

*Doubleday*, 149 F.R.D. at 607.

21

with ongoing litigation because the criminal cases had terminated.[57] The court in

*Abdell* further held that even if the *Hickman* doctrine were in play, the plaintiffs —

suing New York City for constitutional deprivations stemming from their arrests

during protests of the 2004 Republican National Convention ("2004 RNC") — had

a substantial need for the information contained in the DA Data Sheets, which they

could not otherwise obtain.[58]

By contrast, in *Jean v. City of New York*, the court denied a motion to

compel the District Attorney's Office of Queens County ("DAQ") to disclose

communications among ADAs concerning the prosecution of the plaintiff.[59] The

court held that protection of these materials served the interests underlying the

*Hickman* privilege — namely, because the statute of limitations had not expired on

---

[57]     *See Abdell*, 2006 WL 2664313, at * 5 (citing, *inter alia*, *Ostrowski v. Holem*, No. 02 Civ. 50281, 2002 WL 31956039, at *3-*4 (N.D. Ill. Jan. 21, 2002)).

[58]     *See id.* at *6-*7.  In this opinion, I cite to two decisions — *Abdell* and *MacNamara* — that involve civil-rights suits against New York City by demonstrators arrested at the 2004 RNC.  To avoid confusion, I note that neither of these opinions was disturbed by the Second Circuit's recent landmark decision in *In re The City of New York*, which vacated a discovery order by the district court in *MacNamara* and two other related cases.  Specifically, *In re The City of New York* elaborated the law enforcement privilege and held that this privilege barred disclosure of highly-sensitive field reports of undercover NYPD officers who had infiltrated civilian groups planning to protest the RNC. *See* No. 10-0237, — F.3d —, 2010 WL 2294134 (2d Cir. June 9, 2010).

[59]     *See Jean*, 2010 WL 148420.

prosecuting the plaintiff, DAQ had a continuing interest in the matters in dispute.[60] The court further held that the plaintiff failed to make a showing of substantial need for the information and an inability to obtain its substantial equivalent some other way.[61] While the court did not reach the question of whether the communications constituted core work product, it observed in a footnote that a substantial portion of the materials appeared to qualify as core work product.[62]

Here, DANY does not raise any specific arguments about why protecting the Official Corruption Unit investigator's memorandum vindicates the interests advanced by the *Hickman* doctrine.[63] Rather, DANY simply argues that this document "is a legal analysis of the arrests of a number of men for prostitution" and as such constitutes core work product.[64] According to DANY,

---

[60]     *See id.* at *3.

[61]     *See id.*

[62]     *See id.* at *3 n.1.

[63]     As to the purposes of the *Hickman* privilege, disclosing the Official Corruption Unit memorandum clearly does not risk providing a windfall to indolent attorneys or interfering with ongoing litigation, given that the investigation was criminal in nature and apparently is closed. *Cf. Abdell*, 2006 WL 2664313, at *5-*6. However, disclosing the memorandum may have a chilling effect on the Official Corruption Unit and DANY more broadly. If DANY investigations are discoverable, DANY could possibly be less inclined to pursue such inquiries or do so less vigorously. However, because DANY has not made any argument in this regard, it is waived.

[64]     *See* DANY Mem. ¶ 41.

23

"[the memorandum] contains the opinion and thought processes of the assigned investigative prosecutor into the legitimacy of these arrests and whether or not any police officers could be criminally charged in connection with having participated in these arrests."[65]

DANY's characterization is partially correct: in addition to the opinions, impressions, and conclusions of the investigator, this memorandum includes summaries of facts as well as statements of individuals either from *outside* of DANY or whose institutional affiliation cannot be discerned from the memorandum.

"[L]ower courts have consistently treated witness statements as factual rather than opinion work product, even where those statements have been summarized by counsel."[66]  As one court explained:

> [A] distinction must be drawn between summaries of the interviewee's statements on one hand and, explicit mental impressions, conclusions, opinions or legal theories of the

---

[65]     *Id.*

[66]     *Abdell*, 2006 WL 2664313, at *6 (concluding ADA-summarized statements by police officers and other witnesses constituted factual work product, and citing *Johnson v. Bryco Arms*, Nos. 03 Civ. 2582, 02 Civ. 3029, 2005 WL 469612, at *5 (E.D.N.Y. Mar. 1, 2005); *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props. LLC*, No. 01 Civ. 9291, 2002 WL 1455346, at *7 (S.D.N.Y. July 3, 2002); *United States v. Weissman*, No. 94 Cr. 760, 1995 WL 244522, at *9-*10 (S.D.N.Y. Apr. 26, 1995); *Securities and Exchange Commission v. Thrasher*, No. 92 Civ. 6987, 1995 WL 46681, at *6 (S.D.N.Y. Feb. 7, 1995)).

> attorney on the other.  To the extent attorney interview
> notes comprise the former, they are producible upon a
> showing of substantial need.  To the extent such notes are
> more than just summaries of statements and explicitly
> contain (as opposed to implicitly reflecting) the opinions,
> legal theories or mental impressions of the attorney, those
> portions are entitled to greater protection.[67]

Thus, the memorandum's summaries of facts and statements unattributable to

DANY attorneys are factual work product subject to disclosure on a demonstration

by plaintiffs of substantial need and undue hardship.  To obtain the core work

product contained in the memorandum, plaintiffs must additionally establish a

highly persuasive showing of need.

Plaintiffs have met their burden as to the memorandum's factual work

product.  As I have already explained, and as DANY concedes,[68] a pivotal issue in

these cases is whether the officers had probable cause to arrest plaintiffs and other

men for prostitution.  As the court explained in *Abdell*, "courts have regularly held

that in cases of alleged police misconduct, plaintiffs have a substantial need to

discover statements that the officers made to prosecutors."[69]  While the statements

---

[67]     *Weissman*, 1995 WL 244522, at *10 (citing *In re John Doe Corp.*, 675
F.2d 482 (2d Cir. 1982)).

[68]     *See* DANY Mem. ¶ 6.

[69]     *Abdell*, 2006 WL 2664313, at *7 (citing *Boyd v. City and County of
San Francisco*, No. C-04-5459, 2006 WL 1141251, at *4 (N.D. Cal. May 1, 2006);
*Doubleday*, 149 F.R.D. at 607-08).  *Accord Johnson*, 2005 WL 469612, at *5 ("A

here are not by the undercover or other arresting officers, the statements

memorialized in the Official Corruption Unit memorandum nonetheless have

particular significance for plaintiffs' claims. And while plaintiffs may pursue other

avenues to obtain the information contained in these statements, such as by taking

depositions, no alternative method is substantially equivalent to the Official

Corruption Unit investigator's contemporaneous memorandum.[70]

DANY shall disclose the factual information from this memorandum.

DANY shall produce to the Court within seven calendar days of this Opinion and

Order a proposed redacted version of the memorandum consistent with the rulings

---

prior statement by a witness — in this case, a central witness to the case — will
provide plaintiffs with a critical piece of impeachment material . . . .").

[70]    See *Abdell*, 2006 WL 2664313, at *7 ("While the plaintiffs can take
the deposition of each officer, the difficulty of recalling the details of chaotic
events that took place more than two years ago is likely to diminish the utility of
the testimony. . . . And, while other evidence of an officer's knowledge, such as
memo book entries, will be available, it is important for the plaintiffs to be able to
determine the extent to which the information recorded there differs from what the
officer told the ADA."); *Boyd*, 2006 WL 1141251, at *4 (holding
contemporaneous statements of witnesses constitute best evidence); *Johnson*, 2005
WL 469612, at *5 (holding ability to take deposition does not obviate need for
disclosure of prior statement); *Doubleday*, 149 F.R.D. at 608 ("[T]he passage of
time and the present, potential bias of the defendants may color recollections such
that what was said at the time cannot be accurately deciphered [through
depositions].").

issued herein.[71]  DANY may submit an affidavit explaining its proposed
redactions.  These filings may be provided to the Court *ex parte* for *in camera*
review.

### 3.    Public Interest in Confidentiality of DA Files

Finally, with respect to the Official Corruption Unit file, DANY
argues that "the public interest in insuring [sic] the confidentiality of the District
Attorney's files, particularly where it relates to a civil action in which the District
Attorney is a non-party, outweighs the defendants' [sic] (undemonstrated) need for
the information contained within this file."[72]  DANY's objection on this ground is
overruled under the principles and for the reasons previously discussed.

### B.    Trial Division Investigative File

The Trial Division investigation concerned the viability of several of
the prostitution prosecutions.  This investigation is not, as a whole, sealed pursuant
to Section 160.50 because the investigation "did not target any uncharged
individuals for potential prosecution . . . ."[73]  Consequently, DANY produced some

---

[71]      My review of the Official Corruption Unit memorandum reveals that
this document contains little or no core work product of DANY attorneys.
Nonetheless, DANY may submit a redacted version indicating those portions *it
concludes* upon careful reflection are core attorney work product.

[72]      DANY Mem. ¶ 44.

[73]      *Id.* ¶ 18.

27

redacted documents from this file but has withheld thirteen different sets of documents that are detailed below.[74]

## 1.    Inclusion of Sealed Records

While the Trial Division investigative file is not sealed, it contains information and documents from sealed criminal cases of non-plaintiff arrestees. For reasons previously discussed, DANY's objection based on Sections 160.50 and 160.55 is overruled. Therefore, DANY is ordered to produce from non-plaintiff arrestees' files (1) Court Action Sheets[75] and Misdemeanor Backs[76] and (2) "Defendant Details" printouts.[77]  DANY must also produce (3) an NYPD memo detailing an interview with a non-plaintiff arrestee.  For each of these items and those ordered disclosed below, DANY shall redact non-plaintiffs' names, work and home addresses, telephone numbers, emergency contact information, arrest numbers, criminal case numbers, NYSID numbers, day of birth, and other

---

[74]    *See id.* ¶¶ 20-21.

[75]    Court Action Sheets are notes made by the criminal court judge during calendar call and which constitute the official court file. *See id.* ¶ 27.

[76]    The Misdemeanor Backs are the back page of a criminal court file.

[77]    A Defendant Detail printout contains, as the name suggests, a variety of information about a criminal case, such as the defendants' name, date of birth, age, race, sex, and contact information; arrest and charge details; names of witnesses; and court appearance information.

identifying information.[78]  DANY shall not redact birth month and year, age,

occupation, homeownership, arrest location, or prior charges.[79]  For those redacted

documents already produced by DANY to the parties, DANY shall make

disclosures consistent with this Opinion and Order.

### 2.    Attorney Work-Product Privilege

DANY asserts that the work-product privilege bars disclosure of: (5)

one list entitled "Prostitution Arrests at Blue Door & Other Locations"; (6) eight

copies of a list entitled "Prostitution Arrests at the Blue Door"; (7) seven copies of

a list entitled "Prostitution Arrests at Other Locations"; (8) one handwritten list

summarizing the conversations between the undercover and the arrestee, as well as

the arrestee's name and age, the arrest location, and the undercover's badge

number; (9) one list of names of non-plaintiff arrestees and their arrest dates; (10)

email correspondence between prosecutors regarding the prostitution cases; (11)

prosecutors' notes from a meeting with other ADAs regarding the prostitution

---

[78]    In addition to the NYPD memo detailing the interview with the non-plaintiff arrestee, the fourth item withheld by DANY from the Trial Division file is a recording of this interview.  Because this recording likely cannot be sufficiently redacted — *e.g.*, because the non-plaintiff arrestee's voice may by identifiable — it shall not be disclosed absent a consent from this individual.

[79]    The Court's *in camera* inspection of the Trial Division investigative file revealed only two non-plaintiff arrestees with prior criminal history.  For these two individuals' prior criminal history, DANY shall redact all information other than the identification of the charged offenses.

cases; and (12) DANY's response (an edited draft and final copy) to a motion made by one of the non-plaintiff arrestees.

As to items (5) through (9) — the various lists — DANY argues that they are core work product because they "were created by attorneys during the course of litigation for the prostitution criminal cases in order to help them analyze the data, as well as sort through and keep track of the numerous cases."[80]  I have carefully reviewed these documents and conclude that they constitute nothing more than factual work product that plaintiffs have a substantial need for and could not otherwise obtain.  Accordingly, these lists must be disclosed.

Items (10) and (11) — the ADAs notes and emails — contain mostly factual work product and possibly some very limited core work product.  DANY shall disclose the factual information from these documents.  DANY shall produce to the Court within seven calendar days of this Opinion and Order  proposed versions of these documents with redactions consistent with the rulings issued herein.[81]  DANY may submit an affidavit explaining its proposed redactions.  These filings may be provided to the Court *ex parte* for *in camera* review.

---

[80]     *Id.* ¶ 22.

[81]     My review of the the ADA notes and emails reveals that these documents contain little or no core work product of DANY attorneys. Nonetheless, DANY may submit a redacted version indicating those portions *it concludes* upon careful reflection are core attorney work product.

I find as a matter of law that item (12), the edited and final drafts of a court filing, contain *no* privileged core attorney work product. The final draft was, of course, filed with the criminal court, thereby DANY waived any privilege as to that document. The marked draft contains only minor non-substantive edits that in no way comprise mental impressions, conclusions, opinions, or legal theories entitled to protection. DANY shall disclose these documents.

### 3.   Relevance

Lastly, DANY raises two relevance objections. Federal Rule of Civil Procedure 26(b)(1) governs the scope of discovery from parties and non-parties alike,[82] and broadly permits parties to obtain:

> discovery regarding any nonprivileged matter that is relevant to any party's claim or defense — including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter. . . . Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.

"Relevance" under Rule 26 "has been construed broadly to encompass any matter

---

[82]     *See, e.g., Kingsway Fin. Serv., Inc. v. Pricewaterhouse-Coopers, LLP*, No. 03 Civ. 5560, 2008 WL 4452134, at *4-*6 (S.D.N.Y. Oct. 2, 2008) (analyzing motion to quash subpoena of non-party for relevance under Rule 26(b)); *Night Hawk Ltd. v. Briarpatch Ltd., LP*, No. 03 Civ. 1382, 2003 WL 23018833, at *8 (S.D.N.Y. Dec. 23, 2003) (same); *Salvatore Studios Int'l v. Mako's Inc.*, No. 01 Civ. 4430, 2001 WL 913945, at *1 (S.D.N.Y. Aug. 14, 2001) (same).

that bears on, or that reasonably could lead to other matter that could bear on any issue that is or may be in the case."[83]  "[T]he broad scope of discovery delimited by the Federal Rules of Civil Procedure is designed to achieve disclosure of all the evidence relevant to the merits of a controversy."[84]  Where a party has subpoenaed a non-party, "'[t]he party issuing the subpoena must demonstrate that the information sought is relevant and material to the allegations and claims at issue in the proceedings.'"[85]

The thirteenth set of documents from the Trial Division file that DANY withheld are "NYPD Kites" concerning offenses other than prostitution. NYPD Kites are documented complaints from civilians to the NYPD about offenses occurring at a specific location.[86]  DANY argues that the non-prostitution Kites are irrelevant to plaintiffs' claims because they do not pertain specifically to prostitution.  While certainly these documents are not directly on point, they are nonetheless relevant to these suits.  The non-prostitution Kites are the broader

---

[83]    *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978).

[84]    *Thomas E. Hoar, Inc. v. Sara Lee Corp.*, 882 F.2d 682, 687 (2d Cir. 1989).

[85]    *Kingsway Fin. Serv., Inc.*, 2008 WL 4452134, at *4 (quoting *Night Hawk Ltd.*, 2003 WL 23018833, at *8).

[86]    *See* DANY Mem. ¶ 32.

context of the prostitution arrests, for the NYPD publicly stated that in pursuing

the prostitution arrests it was responding to civilian complaints about conduct not

necessarily limited to prostitution.[87]

DANY also contends that the sealed cases of non-plaintiff arrestees

are irrelevant to plaintiffs' civil-rights claims.  This objection is overruled.  As I

have discussed, non-plaintiffs arrestees' criminal cases are part of the context of

plaintiffs' arrests and claims and, as such, are possible evidence bearing on the

unconstitutional City scheme alleged by plaintiffs.

### C.    Plaintiffs' Criminal Case Files

DANY disclosed documents from plaintiffs' criminal case files, with

the exception of prosecutor notes to the files ("ADA File Notes"), prosecutor notes

regarding court dates ("Court Calendar Notes"), the Criminal Court Supervisor

Evaluation Sheets, and New York State "Informational Sheets" (colloquially

known as "rap sheets").[88]

### 1.    ADA File Notes, Court Calendar Notes, and the Criminal Court Supervisor Evaluation Sheets

DANY represents to the Court that there are no ADA File Notes

---

[87]    *See* Hauser, *supra* note 1 (reporting that "[t]he chief police spokesman, Paul J. Browne, said the police were not singling out gay men but merely responding to complaints about *illegal activities*" (emphasis added)).

[88]    *See* DANY Mem. ¶ 2.

beyond those also contained within the Trial Division investigative file. I have already addressed this issue.[89]

The Court Calendar Notes are internal communications among ADAs made in the course of the prostitution prosecutions. Specifically, these documents convey the assigned prosecutor's directions, advice, and questions to those ADAs covering the matter at a court appearance, as well as the covering ADA's communications following the court date. While the Court Calendar Notes often summarize statements made in open court, such as the next court appearance, these documents nonetheless are comprised almost entirely of core work product and, as such, need not be disclosed.

The Criminal Court Supervisor Evaluation Sheets are forms that supervising attorneys utilize to memorialize their evaluation and opinion about how the assigned ADA should handle a case.[90] However, in the files of Crosby, Daniels, and Richardson, the sheets contain no such information. In fact, not only is the space for the supervising attorney to initial the sheet blank on each, the forms contain no notations whatsoever beyond the case name, docket number, and assigned ADA. DANY shall produce these documents from plaintiffs' files.

---

[89]     *See supra* pp. 29-30 (discussing items (10) through (12) of the Trial Division file).

[90]     *See* DANY Mem. ¶ 8.

34

DANY may withhold the Criminal Court Supervisor Evaluation Sheet from Reis's file, however, because it is initialed and therefore reasonably constitutes an internal communication between the assigned ADA and his supervisor.

### 2.    Rap Sheets

Finally, DANY objects to producing plaintiffs' rap sheets because (1) the State of New York Criminal Justice Services Agency provided these documents to DANY on a strictly confidential basis; (2) plaintiffs may obtain these documents directly from the agency that generated them; and (3) each plaintiff was provided his own rap sheet at arraignment. Additionally, DANY argues plaintiffs' rap sheets are irrelevant to their civil claims.

Rap sheets contain a criminal defendant's pedigree information provided at the time of arrest, the charges for which he was arrested, and his past criminal history. Plaintiffs' rap sheets are relevant to their claims that they were falsely arrested because the documents show that none had been arrested previously for prostitution. Nonetheless, because plaintiffs may obtain these documents from the agency that provided them, the state confidentiality rule outweighs plaintiffs' need for this information.

## IV.    CONCLUSION

For the reasons stated above, DANY's motion to quash is granted in

part and denied in part.

With respect to the Official Corruption Unit File, DANY is hereby ordered to disclose: (i) the list of arrestees, with non-plaintiff arrestees' names, arrest numbers, and day of birth redacted; (ii) the arrestees' criminal court papers, with non-plaintiff arrestees' names, arrest numbers, and criminal court file numbers redacted; (iii) the news articles; and (iv) the facsimile coversheets. DANY shall submit to the Court an affidavit from someone with knowledge of these faxes attesting to the content of the transmissions and, specifically, whether or not all pages transmitted have been produced to the Court for *in camera* inspection. DANY shall either disclose the investigator's memorandum or submit to the Court a proposed version of the memorandum that redacts information identifying undercover officer #3371, #5601, or #31107, as well as core work product of DANY attorneys. DANY may submit an affidavit explaining its proposed redactions.

With respect to the Trial Division File, DANY is hereby ordered to disclose: (i) the Court Action Sheets and Misdemeanor Backs; (ii) printouts of "Defendant Details"; (iii) the NYPD memo detailing an interview with a non-plaintiff arrestee; (iv) the list entitled "Prostitution Arrests at Blue Door & Other Locations"; (v) the eight copies of a list entitled "Prostitution Arrests at the Blue

36

Door"; (vi) seven copies of a list entitled "Prostitution Arrests at Other Locations";

(vii) the list summarizing the conversations between the undercover and the

arrestee, as well as the arrestee's name and age, the arrest location, and the

undercover's badge number; (viii) the list of names of non-plaintiff arrestees and

their arrest dates; (ix) the edited and final draft court filing; and (x) NYPD Kites

concerning offenses other than prostitution.  For all of these documents, DANY

shall redact non-plaintiff arrestees' names, home and work addresses, telephone

numbers, emergency contact information, arrest numbers, criminal case numbers,

NYSID numbers, day of birth, and other identifying information.  DANY shall not

redact birth month and year, age, occupation, homeownership, arrest location, or

prior charges.

DANY shall either disclose the prosecutors' (xi) email

correspondence and (xii) meeting notes or submit to the Court proposed versions

of these documents redacting information identifying non-plaintiff arrestees as well

as core work product.  DANY may submit an affidavit explaining its proposed

redactions.  For those redacted documents already produced by DANY to the

parties from the Trial Division file, DANY shall make disclosures consistent with

this Opinion and Order.

With respect to plaintiffs' criminal case files, DANY shall disclose

37

Crosby's, Daniel's, and Richardson's Criminal Court Supervisor Evaluation
Sheets.

       All submissions to the Court from DANY ordered or permitted herein
shall be made within seven calendar days of this Opinion and Order, and may be
submitted *ex parte* for *in camera* review.

       The Clerk of Court is directed to close this motion (#29 in 09 Civ.
9693, #33 in 09 Civ. 0694, and #25 in 09 Civ. 9695).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:     June 22, 2010
          New York, New York

## - Appearances -

**For Plaintiffs:**

Michael L. Spiegel, Esq.
111 Broadway, Suite 1305
New York, New York 10006
(212) 581-8558

**For Defendants:**

Tonya Jenerette
Senior Counsel
The City of New York Law Department
100 Church Street
New York, New York 10007
(212) 788-0993
(212) 788-9776

**For the District Attorney of New York County:**

Leila Kermani
Assistant District Attorney
New York Country
One Hogan Place
New York, New York 10013
(212) 335-9000